Filed 6/23/21  P. v. Diaz CA2/2

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

# IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## SECOND APPELLATE DISTRICT

## DIVISION TWO

| | |
|---|---|
| THE PEOPLE, | B306058 |
| Plaintiff and Respondent, | (Los Angeles County Super. Ct. No. BA431915) |
| v. | |
| EZEQUIAS DIAZ, | |
| Defendant and Appellant. | |

APPEAL from a judgment of the Superior Court of Los Angeles County, Douglas W. Sortino, Judge.  Affirmed.

Johanna Pirko, under appointment by the Court of Appeal, for Defendant and Appellant.

Xavier Becerra, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Susan Sullivan Pithey, Assistant Attorney General, Noah P. Hill and Stephanie C. Santoro, Deputy Attorneys General, for Plaintiff and Respondent.

Defendant and appellant Ezequias Diaz (defendant) appeals from his conviction of attempted murder.[1] He contends that the prosecutor engaged in prejudicial misconduct during closing argument by misstating the law, that counsel rendered ineffective assistance by failing to object, and that the trial court improperly relied on the facts underlying the enhancement allegations to impose the aggravated term. Finding defendant's contentions forfeited or without merit, we affirm the judgment.

## BACKGROUND

Defendant was charged with the attempted murder of Guadalupe Sanchez in violation of Penal Code sections 187 and 664, subdivision (a).[2] It was alleged that the attempted murder was willful, deliberate, and premeditated; that defendant personally inflicted great bodily injury upon the victim within the meaning of section 12022.7, subdivision (a); and that he used a deadly and dangerous weapon, a car, in the commission of the offense within the meaning of section 12022, subdivision (b)(1). A jury convicted defendant of the attempted murder but found not true the allegation that it was willful, deliberate and premeditated. The jury found true the allegations of great bodily injury and the use of a deadly weapon. The trial court sentenced

---

[1] The information filed in this case has defendant's name as Jose Antonio Ruiz, which was an alias defendant used at his place of employment. We found nothing in the record to show that the information was ever amended to reflect defendant's true name, but the remainder of the record, including the minutes and the verdict, refers to defendant's true name.

[2] All further statutory references are to the Penal Code, unless otherwise indicated.

defendant to a total of 13 years in prison, consisting of nine years for the attempted murder, plus three years for the great bodily injury enhancement and one year for the use of a deadly weapon.[3]

Defendant filed a timely notice of appeal from the judgment.

**Prosecution evidence**

Sanchez testified that on an evening in August 2014, he bought a beer at Jerry's Liquor store on his way home from work, which he took outside and drank in front of the liquor store. During this time a man he did not know came out of the store and ran him over with a car. Sanchez could not remember the incident very well. He did recall waking up in the hospital, where he stayed for about three weeks undergoing surgeries. His leg and chest were injured, and he lost a testicle. It took him about six months to recuperate, during which time he could not work and had to use crutches. At the time of trial in early 2020, his leg still hurt, and he was able to work only part time.

Sanchez was shown a surveillance video of the incident, in which he was able to identify himself and the man who ran him over. Sanchez remembered that he and the man had argued, but he could not remember what they argued about. Sanchez denied that the video showed him reaching into his backpack during the

---

[3] In a footnote in respondent's brief it is noted that the abstract of judgment is not included in the clerk's transcript. Within the footnote there appears to be a motion pursuant to rules 8.155(a) and 8.340(c) of the California Rules of Court to augment the record with the abstract. However, as this motion does not comply with rule 8.155(a), and respondent has not claimed to have requested a copy of the abstract from the superior court, we deny the motion.

encounter with the man but said it showed him just adjusting the strap. Sanchez denied that he had a gun or said to the man that he had a gun and was going to shoot him, but he could not otherwise remember what he said or did not say. Sanchez remembered that he had $200 with him that day, and when the hospital returned his property, the $200 was included.

Los Angeles Police Officer Brendan Flynn arrived at Jerry's Liquor store soon after Sanchez had been injured. He testified to having observed tire marks on Sanchez's abdomen and to having recovered Sanchez's testicle near where he lay. Firefighter/paramedic Brad Ibanez arrived on the scene a few minutes later finding Sanchez impaired, altered and combative. Ibanez stabilized Sanchez and put him in restraints. He observed that Sanchez had facial abrasions, road rash on the right forearm, severe road rash and bruising to his abdomen, a testicular sac rupture, and blood in his mouth.

Defendant had gone to Jerry's Liquor store that evening with his friend and coworker Alba Florian. Florian testified that the two of them went there in defendant's car to buy beer. While there they saw a man whom they did not know (Sanchez) right outside the door. When they came out with their beer, the man started bothering them and appeared to be drunk. Sanchez mostly bothered Florian, seeming to flirt, but using foul language. Defendant told him to relax, to go away and stop bothering her, but Sanchez ignored defendant and kept insulting Florian. Sanchez also insulted defendant and behaved as though he wanted to fight. Defendant and Sanchez began arguing, and defendant, no longer calm, appeared to be about to fight Sanchez. Florian denied that the two men physically fought or that there was any punching or kicking. Florian tried to pull defendant

4

away, saying, "Let's go," and claimed she saw another man approach, apparently to help Sanchez. Later, she testified that the second man came after she got into defendant's car, that defendant followed her a short time later, and that he did not punch or kick anyone. She claimed that as defendant walked away, Sanchez continued to insult defendant, and that as defendant was about to start the car, Sanchez walked in front of it, making challenging hand gestures and preventing them from going forward. Florian ducked down, closed her eyes, and did not see anything until they were out of the parking lot. She began crying and defendant told her to be quiet. They did not speak at all after that and did not discuss the incident.

During her testimony Florian was reminded of her interview with Detective Reyes about four months after the incident, in which she said that just before she bent forward, she screamed and then heard a bump. Defendant then backed up and she shouted, "You killed him," or something to that effect. Defendant told her to stop it and "shut up," and that the man stood up. Florian told Detective Reyes that when defendant backed up she heard a crack, she screamed, asked defendant what happened, and begged him to stop. Defendant yanked her hair and said, "Calm down now." She also told Detective Reyes that she was afraid of defendant, as she found him intimidating.

Sometime after her interview with the detective, a coworker told defendant and Florian that the police were looking for him, and he had seen them on television. Defendant told Florian that he had not realized that he had run over the man and said he was just trying to scare the man. Defendant stopped going to work once he found out the police were looking for him. He did not answer her calls for two or three months. When they

5

did speak months later, she told defendant that Detective Reyes wanted to talk to him and suggested defendant comply.  He refused, saying that he was not at fault.  At some point, defendant told Florian that he was in Salt Lake City and later that he had moved to Las Vegas.

Surveillance videos were played in court as Florian described the action.[4]  She and defendant were identified as they walked into the liquor store and back out.  They are seen sitting down as they begin drinking their beers.  Sanchez, with his backpack, is seen on the sidewalk, also drinking a beer.  A man in a blue shirt stands next to Sanchez.  Another angle shows Florian and defendant walking out of the liquor store with Sanchez leaning against a wall at the bottom of the screen.

After awhile Sanchez is seen as he starts bothering defendant and Florian.  Defendant is seen throwing a beer bottle at Sanchez and punching and kicking him.  The man in the blue shirt is no longer seen in the video when defendant was punching and kicking Sanchez.

**Defense evidence**

### *Blood alcohol expert*

The defense called a forensic chemist who had reviewed Sanchez's laboratory results from his hospital record.  Sanchez's blood was drawn at 9:35 p.m., tested and found to have a blood alcohol content that was high for a human being, the equivalent of a 0.267 blood alcohol level if tested using whole blood rather than plasma (more than three times the 0.08 percent presumed as being impaired to drive).  A 160 pound man would have fully

---

[4]     The exhibits have not been transmitted to this court for our review.  We thus summarize the action from the testimony of Sanchez, Florian and defendant.

absorbed the alcohol equivalent to 11 and one-half 12-ounce, 4 percent (light) beers.

### *Defendant's testimony*

Defendant testified that on August 1, 2014, he had been employed for five years as the manager of the clothing company where he and Florian worked. Though married, defendant was dating Florian at the time. On direct examination defendant testified that he drove to work that day in his white Ford Explorer SUV, and after work he gave a ride to Florian. Between 8 and 8:30 p.m., they stopped to buy beers and were sitting on the curb in front of the liquor store drinking them when Sanchez, who appeared to be intoxicated, approached them and asked for money. Sanchez became hostile and cursed at them when defendant said he did not have money, and Florian told him to go away. Defendant then stood, faced Sanchez and told him not to be disrespectful. Sanchez responded, "What? Do you want to fight with me?" When Florian urged defendant to ignore Sanchez and tried to lead him away, Sanchez responded, "What? Are you going to hide behind a woman?" Defendant told Florian to get in the car; and because Sanchez continued to provoke and insult him using foul language, defendant grabbed a bottle and threw it at Sanchez but missed him. Defendant also tried to kick Sanchez but claimed that he did not remember making contact. When shown portions of the surveillance video, defendant admitted that the video showed him throwing a beer bottle at Sanchez, kicking him once and striking him in the chest once.

Defendant also claimed that as Sanchez moved his backpack from his back to his front, Sanchez said he was going to kill defendant and that he had a gun in his backpack. Defendant saw Sanchez trying to reach into the backpack, felt afraid,

7

panicked, and angry. He quickly got into his car and backed out of his parking spot. Defendant did not see a gun but saw Sanchez moving his hands in a challenging manner, so defendant drove the car toward Sanchez, accelerated, and ran him over. Because there was a wall in front of the car and no exit from the parking lot in that direction, defendant backed up in order to get away. He claimed that it all happened in seconds.

Defendant did not tell Florian that Sanchez had a gun or that he threatened to kill him, explaining that she was hysterical, crying and bent down. He denied pulling her hair, claiming that he just put his hand on her head and told her to calm down. When a coworker told him about the television broadcast, defendant did not go to the police because he was afraid they would not believe his story. He moved to Salt Lake City for about two months, then moved to Las Vegas when his former employer moved his business. Defendant was eventually arrested in Las Vegas about two years later.

On cross-examination, defendant testified that Sanchez approached him and Florian about 20 minutes after they arrived, and Sanchez's behavior toward Florian made defendant angry because he was disrespecting a woman. Defendant also claimed to be afraid of Sanchez.[5] Sanchez continued to challenge him and insult them. Defendant testified that he had no other option and explained, "If he's disrespecting me and he's disrespecting me, obviously, I had to react in some way." In response to the prosecutor's question whether he had no choice but to punch and kick a man who was insulting him, defendant said, "Because he

---

[5]     Defendant never saw two men, testifying that only one man confronted him.

8

told me he wanted to fight." Defendant agreed that he wanted to fight Sanchez, because "[h]e had insulted me so many times that it's obvious that I had to fight him." Defendant explained that he threw the bottle to "shut [Sanchez] up" when he started "cussing [him] out"; and although Sanchez was across the parking lot when he threw it, defendant "could hear what he was saying." Sanchez kept on talking and making his hand motions. The insults and challenging hand motions were "making" defendant react in anger. Defendant then went to Sanchez and kicked him, but when that did not quiet him, defendant punched him. Defendant claimed Sanchez swung at him; and although Sanchez did not connect and hit defendant, it was not defendant's decision to fight "with everything he was saying to me, he was trying to provoke a fight with me and you can't ignore that. One can't ignore that with someone you don't even know."

After defendant told Florian to get in the car, he claimed that he got into his car and put it in reverse. Sanchez "was already in front of the car" and waving his hands back and forth above his head. Defendant denied that Sanchez remained where he had left him, some distance from the car. In still photographs of the parking lot, defendant identified both his SUV and Sanchez, who was standing with his hands down at his side and empty space around him. When asked whether he aimed his car directly at Sanchez, defendant testified, "I didn't exactly aim it. It was rather that the person was provoking me. It was a matter of seconds. It wasn't that I aimed it or planned anything. It was just a matter of seconds." Defendant admitted that when he saw Sanchez in front of him, he accelerated, despite knowing that it was the opposite direction from the only exit from the parking lot. Defendant explained that he was looking at Sanchez to see if he

9

was going to get the weapon he said he had. Sanchez was standing still, but his hands were moving.

Defendant admitted to having run over Sanchez because Sanchez continued to provoke him. Although defendant could not hear what Sanchez was saying because the windows were up, he could see that Sanchez continued to talk. Defendant agreed that the video showed that the SUV ran completely over Sanchez's body with the right front tire. Defendant explained that although he knew that he had run over Sanchez, having felt the car go over him, defendant did not know "how the action took place." He also denied that he felt the tires go over Sanchez's body and claimed that he did not feel anything when he was going forward. Defendant also claimed that although he knew he had hit Sanchez, he thought Sanchez had just been pushed, causing him to fall in front of the car, making it necessary for defendant to put his car in reverse. However, defendant then admitted he thought he had run over Sanchez going forward, which made him feel that he had to flee, so he backed up in a panic. Defendant explained that it was when he backed over Sanchez that he felt his car going over something. Knowing he had run over Sanchez a second time, defendant drove away but claimed he drove away because he saw Sanchez stand up.

Defendant acknowledged that he "partly" understood that he had done something wrong but pointed out that he was provoked. Defendant explained that he did not worry about Sanchez or feel bad, because Sanchez had threatened to kill defendant. He explained that he did not stay and call the police because the police would sometimes believe the victim more than the person who was aggressive. Defendant later "felt partly guilty for doing that, for, in a way, taking his life and he ruined

10

mine too." Defendant drove away and refused to discuss the event with Florian. He never told her that Sanchez was trying to pull out a gun or that he had threatened to shoot defendant.

## DISCUSSION

### I. Alleged prosecution misconduct

Defendant contends that his conviction should be reversed because the prosecutor engaged in prejudicial misconduct by misstating the law during rebuttal closing argument. Turning to defendant's claim of self-defense, the prosecutor stated, "This is a perfect case. Self-defense is one of those things that you have to decide." He continued:

> "Do you think this is okay, to do what he did? I can't hold him responsible. The police can't hold him responsible. The judge can't hold him responsible. This is in your hands, as our members of our community, to say, no, you've crossed the line with that one. Okay? [¶] And it's five years coming. He thought this day was never going to come. He thought this would all just blow over if he just disappeared to Nevada or wherever he went. Okay? But presumption of innocence ends now because you've heard the evidence now and you have to make a decision about what kind of conduct is going to be okay."

Defendant notes the phrase, "presumption of innocence ends now," standing alone, and claims a misstatement of the law, as the presumption of innocence continues into deliberations until the jury reaches a verdict. (*People v. Dowdell* (2014) 227 Cal.App.4th 1388, 1407-1408.) However, defendant acknowledges that his trial counsel did not object or request an admonition. "As a general rule a defendant may not complain on

11

appeal of prosecutorial misconduct unless in a timely fashion—and on the same ground—the defendant [requested] an assignment of misconduct and [also] requested that the jury be admonished to disregard the impropriety. [Citation.] Additionally, when the claim focuses upon comments made by the prosecutor before the jury, the question is whether there is a reasonable likelihood that the jury construed or applied any of the complained-of remarks in an objectionable fashion." (*People v. Samayoa* (1997) 15 Cal.4th 795, 841.)

It is clear that the trial court would have given the jury the appropriate admonition had it been requested. During the prosecutor's opening summation, when defense counsel objected to a statement, the trial court overruled the objection but admonished the jury as follows: "[T]o the extent there is a conflict with the law between what the lawyer is saying and the instructions I read, it's the instructions that control. During arguments, the lawyers make arguments about how you should construe things and how you should find things, but it's up to you to make those decisions and follow the law that I give to you." "It is fundamental that jurors are presumed to be intelligent and capable of understanding and applying the court's instructions." (*People v. Gonzales* (2011) 51 Cal.4th 894, 940.) We thus agree with respondent that the issue is forfeited.

Defendant contends that despite counsel's failure to object or request an admonition, reversal is required because the failure amounted to a denial of effective assistance of counsel as guaranteed by the Sixth Amendment to the United States Constitution and article I, section 15 of the California Constitution. (See *Strickland v. Washington* (1984) 466 U.S. 668, 686-688.) A defendant bears a heavy burden to demonstrate both

12

counsel error and resulting prejudice.  (*Id*. at p. 687.)  A reviewing court may proceed directly to the issue of prejudice if it is easier to dispose of an ineffectiveness claim on that basis.  (*Ibid*.; *People v. Fairbank* (1997) 16 Cal.4th 1223, 1241.)  Such is the case here.

Defendant must affirmatively prove prejudice by demonstrating a reasonable probability that the result of the proceeding would have been different absent the alleged error.  (*Strickland v. Washington*, *supra*, 466 U.S. at p. 694.)  "A reasonable probability is a probability sufficient to undermine confidence in the outcome."  (*Ibid*.)  Defendant attempts to show prejudice by arguing that prejudice is shown by the jury's finding the allegation that the attempted murder was committed willfully, deliberately, and with premeditation to be not true.  He argues that this not true finding demonstrates that "[t]he jury had doubts about the prosecution's case and *may have* questioned whether [defendant] intended to kill Sanchez when he struck him with his truck."  (Italics added.)

"A defendant must prove prejudice that is a "'demonstrable reality," not simply speculation.'"  (*People v. Fairbank*, *supra*, 16 Cal.4th at p. 1241.)  Defendant has failed to do so here.  When the prosecutor's comment is viewed with the jury instructions given, the more reasonable inference to be drawn from the jury's not true finding is that the jurors understood and took seriously their roles by following the trial court's instruction to presume defendant innocent until satisfied that the prosecutor proved premeditation beyond a reasonable doubt.  The jury was so instructed prior to the prosecutor having uttered the disputed phrase.  The first instruction was CALCRIM No. 200, which included:  "You must follow the law as I explain it to you, even if

13

you disagree with it.  If you believe that the attorney's comments on the law conflict with my instructions, you must follow my instructions."  Shortly thereafter, the trial court read CALCRIM No. 220, which included:

> "A defendant in a criminal case is presumed to be innocent.  This presumption requires that the People prove a defendant guilty beyond a reasonable doubt.  Whenever I tell you the People must prove something, I mean they must prove it beyond a reasonable doubt.  [¶]  Proof beyond a reasonable doubt is proof that leaves you with an abiding conviction that the charge is true.  The evidence need not eliminate all possible doubt because everything in life is open to some possible or imaginary doubt.  [¶] In deciding whether the People have proved their case beyond a reasonable doubt, you must impartially compare and consider all the evidence that was received throughout the entire trial.  Unless the evidence proves the defendant guilty beyond a reasonable doubt, he is entitled to an acquittal and you must find him not guilty."

By the time final arguments began, the jury had been instructed no fewer than seven more times regarding the prosecution's burden of proof beyond a reasonable doubt:  See CALCRIM No. 601, regarding premeditation and deliberation; CALCRIM No. 603, regarding attempted voluntary manslaughter and heat of passion; CALCRIM No. 604, regarding imperfect self-defense; CALCRIM No. 3145, regarding personal use of a deadly weapon; CALCRIM No. 3160, regarding great bodily injury; CALCRIM No. 3470, regarding self-defense and defense of another; and CALCRIM No. 3517, regarding verdict forms.

Defendant also suggests that the not true finding as to premeditation shows that without the prosecutor's remark

14

regarding the presumption of innocence, at least one juror may have believed that he acted in self-defense. More likely the jurors found defendant guilty of attempted murder because they believed defendant's testimony that he acted in anger, but they had a reasonable doubt about deliberation and premeditation.[6] Defendant admitted reacting to Sanchez because he was angry and felt disrespected, claiming that he had no other option because "[i]f he's disrespecting me and he's disrespecting me, obviously, I had to react in some way." Defendant tried throwing a beer bottle at Sanchez, tried kicking and punching him, but the insults continued. Defendant admitted he ran over Sanchez because he had been provoked by Sanchez, who was directly in front of him waving his hands back and forth. Defendant admitted that he ran over Sanchez a second time in order to facilitate his escape from the scene.

We cannot agree with defendant that without the prosecutor's remark, the jury would have had reason to find that defendant acted in self-defense or imperfect self-defense. Defendant testified that he was walking *away* from Sanchez trying to get into his car as soon as possible at the time he saw Sanchez reached into his backpack, an action that Sanchez described as adjusting the strap on his backpack, not trying to unzip or reach into it. Since defendant failed to provide the surveillance videos, still photographs, or any other exhibits to this court for review, he also fails to present an adequate record for review on appeal and to affirmatively demonstrate error. (See

---

[6] The trial court read CALCRIM No. 601, which defines deliberation and premeditation including "[a] decision to kill made rashly, impulsively, or without careful consideration of the choice and its consequences is not deliberate and premeditated."

15

*People v. Whalen* (2013) 56 Cal.4th 1, 84, disapproved on another point in *People v. Romero and Self* (2015) 62 Cal.4th 1, 44, fn. 17.) Error is never presumed from a silent record. (*Denham v. Superior Court* (1970) 2 Cal.3d 557, 564.) We thus assume that the video and still photographs would support the jury's rejection of defendant's claim of self-defense.[7]

We conclude that overwhelming evidence shows that if defendant harbored any reasonable or unreasonable belief in the need for self-defense, it ended when defendant admittedly accelerated toward Sanchez upon seeing him standing at some distance with his hands visible and either down at his sides or waving in the air, and not reaching into his backpack. Any such belief also ended when defendant admittedly backed up knowing that he had run over Sanchez and had felt the car go over him.

We conclude that if defense counsel erred, the error was harmless, and defendant has thus failed to demonstrate ineffective assistance of counsel.

## II. Dual use of facts to aggravate term

Defendant contends that the trial court improperly relied on the facts underlying the enhancement allegations to impose the high term, based on the provision in section 1170, subdivision (b), which provides that "the court may not impose an upper term by using the fact of any enhancement upon which sentence is imposed under any provision of law," and on California Rules of

---

[7]  We observe that at the sentencing hearing the court noted there was no evidence that a gun was recovered at the scene or in Sanchez's backpack. The court also stated that the video did not show anything that could be construed as Sanchez reaching for something in the backpack.

Court, rule 4.420(c).[8]  In particular, defendant contends that the court's comments at sentencing indicate that it relied upon the use of a car as a deadly weapon and upon Sanchez's injuries in imposing the upper term, although the court also imposed a three-year great bodily injury enhancement under section 12022.7, subdivision (a), and a one-year enhancement for the use of a deadly weapon pursuant to section 12022, subdivision (b)(1).

Respondent asserts that defendant has forfeited this issue by failing to object at the sentencing hearing.  Because improper dual use is not a jurisdictional error, "[a] party in a criminal case may not, on appeal, raise 'claims involving the trial court's failure to properly make or articulate its discretionary sentencing choices' if the party did not object to the sentence at trial.  [Citation.]  The rule applies to 'cases in which . . . the court purportedly erred because it double-counted a particular sentencing factor . . . .'" (*People v. Gonzalez* (2003) 31 Cal.4th 745, 751, quoting *People v. Scott* (1994) 9 Cal.4th 331, 353.)  Defendant claims to have preserved the issue with an objection in his sentencing memorandum to the dual use of a car as a deadly weapon enhancement and as a factor in aggravation.  However, defendant did not object to the dual use of facts underlying the great bodily injury enhancement.  "Only a single aggravating

_____

[8]    California Rules of Court, rule 4.420(c) provides:  "To comply with section 1170(b), a fact charged and found as an enhancement may be used as a reason for imposing a particular term only if the court has discretion to strike the punishment for the enhancement and does so.  The use of a fact of an enhancement to impose the upper term of imprisonment is an adequate reason for striking the additional term of imprisonment, regardless of the effect on the total term."

17

factor is required to impose the upper term . . . ." (*People v. Osband* (1996) 13 Cal.4th 622, 728.)  Thus defendant has forfeited his challenge based upon facts relating to great bodily injury.

Regardless, the trial court cited many facts in aggravation, not just those supporting the two enhancements.  The reviewing court looks at whether the trial court could have based the aggravating factor on facts other than those supporting the enhancement, and if so, the sentence may stand.  (*People v. Garcia* (1995) 32 Cal.App.4th 1756, 1775.)  Here, the court stated that it had reviewed the defense sentencing memorandum and then expressed many reasons for finding that granting probation was not justified.   The court then applied those reasons and others to support the high term.  In essence, the court expressed the intention to impose the high term on the ground that this was an *aggravated* attempted murder.  The court found this case "as serious [as] you can get in terms of charge," not just attempted murder but "an incredibly aggravated, violent attempted murder with a vehicle."  Thus the court considered, more than defendant's use of a car as a deadly weapon to inflict great bodily injury, but rather the extreme violence with which defendant committed his crime.

The sentencing court may appropriately base an aggravated term on facts surrounding the defendant's crime that exceed the minimum necessary to establish the offense or enhancement.  (Cf. *People v. Castorena* (1996) 51 Cal.App.4th 558, 561 ["'while an element of this crime is gross negligence, defendant's conduct exceeded even the word gross'"].)  Here, the court acknowledged that some of the facts were already part of the offense and the enhancement allegations, but stated that far

18

more facts were proven in this case than the minimum needed to establish an attempted murder, an intent to kill, or great bodily injury. "Some physical pain or damage, such as '[a]brasions, lacerations, and bruising can constitute great bodily injury.'" (*People v. Quinonez* (2020) 46 Cal.App.5th 457, 464.) Here, the court listed Sanchez's injuries depicted in photographs taken at the hospital, such as severe bruising and scrapes from the knees through the groin area and up through his torso, as well as the permanently dismembered testicle, which clearly exceeded healable abrasions, lacerations, and bruising necessary to establish great bodily injury.

Great violence is a separate factor that may appropriately be considered in aggravation of a violent crime, where great violence is not an element of the crime. (See *People v. Garcia* (1989) 209 Cal.App.3d 790, 794 [forcible rape]; Cal. Rules of Court, rule 4.421(a)(1).) Here, the trial court considered the extreme violence of defendant's conduct, explaining that during trial there were comments indicating that defendant ran over Sanchez at least twice, although when viewing the surveillance video the court perceived wheels going over him at least three times and then dragging Sanchez for a period of time. The court noted that at "every step of the way [defendant] chose to make this situation worse and increase the violence." Defendant was the aggressor in the fight, while Sanchez appeared to be acting defensively.

The court acknowledged that Sanchez was probably annoying and drunk, and that he made disparaging remarks about Florian, but "[n]one of that, in any way, justifies the defendant's reactions thereafter." The trial court observed that defendant could have left by backing out of his parking place and

19

turning toward the parking lot exit adjacent to his parking space, but he did not.  Without disputing the jury's verdict the court also pointed out that there was sufficient evidence to support premeditation and deliberation, which would have resulted in a life term; thus the verdict gave defendant a significant break.

In sum, the court did not rely simply on defendant's *use* of his car as a deadly weapon or the infliction of great bodily injury on the victim to impose the high term, as defendant claims.  We conclude that defendant forfeited at least one of his claims of dual use, and that in any event, the trial court did not err.

**DISPOSITION**

The judgment is affirmed.


_____, J.
CHAVEZ


We concur:


_____, Acting P. J.
ASHMANN-GERST


_____, J.
HOFFSTADT